## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREGG ALLMAN, JAIMOE f/k/a JOHNNY LEE JOHNSON, AND BUTCH TRUCKS INDIVIDUALLY, AS MEMBERS OF "THE ALLMAN BROTHERS BAND" AND AS PARTNERS IN "THE ALLMAN BROTHERS BAND RECORDING COMPANY"; ELMO SHROPSHIRE, INDIVIDUALLY AND AS A MEMBER OF "ELMO & PATSY"; ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> vs. <br><br> SONY BMG MUSIC ENTERTAINMENT, A Delaware General Partnership, <br><br> Defendant. | Civ. No. 1:06-cv-03252-GBD <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Gregg Allman, Jaimoe f/k/a Johnny Lee Johnson and Butch Trucks, individually, as members of "The Allman Brothers Band," and as partners in "The Allman Brothers Band Recording Company"; and,Elmo Shropshire, individually, and as a member of "Elmo & Patsy"; (collectively, "Plaintiffs") individually and on behalf of all other persons and entities similarly situated, by their undersigned attorneys, for their complaint against the above-captioned defendant, allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made by and through their attorneys, as follows:

## NATURE OF THE ACTION

1.      This is a class action for breach of contract and declaratory judgment against defendant Sony BMG Music Entertainment ("Sony Music"), a Delaware General Partnership of Sony, Inc. and Bertelsmann, A.G., and its divisions and predecessors in interest, including, but not limited to, Columbia Records, Epic Records and 550 Music, Sony Music Entertainment, Inc. and CBS Records, Inc. ("CBS"), predicated upon Sony Music's failure to properly account to Plaintiffs, and the Class defined below, for royalties with respect to recordings of their musical performances or recordings produced by them which have been sold by "Music Download Providers," (described in more detail in paragraphs 23-28, and including Apple, Buy.com, Full Audio Download, Liquid Audio, Microsoft, Music Net, Napster, Pressplay and Sony Connect, among others) and "Ringtone Providers" (described in more detail in paragraphs 29-35, and including Cingular Wireless, Verizon Wireless, Sprint, T-Mobile, Dwango Wireless, Zingy, 9 Squared, HIFI Ringtones, IAM Mobile, Securycast, Arvato Mobile and Hudson Soft, among others) through digital distribution.

2.      This action seeks redress for Sony Music's knowing and flagrant violations of the clear terms of its agreements with recording artists and music producers whereby Sony Music has paid such artists and producers only a miniscule percentage of the royalties owed for leasing of their recordings to Music Download Providers and Ringtone Providers.  (The recording artists and producers entitled to receive royalties pursuant to the Sony Music Recording Agreements, as defined below, are hereinafter sometimes jointly referred to as "Recording Artists".)  As detailed below, of the 99 cents charged to the consumer by Apple for each Music Download, Plaintiffs and the Class receive approximately 4.25 cents thereof.   From the $1 to $1.50 that Sony Music receives for a Ringtone, Plaintiffs and the Class receive approximately 8.3 cents thereof.

3.      Upon information and belief, Sony Music leases its catalogue of master recordings, which embody the performances of all Sony Music Recording Artists, to Music Download Providers

in exchange for a fee of approximately 70 cents per digital download, and to Ringtone Providers in exchange for a fee of approximately 50% of the retail sale price of each digital download.

4.      Sony Music's recording agreements require Sony Music to pay its recording artists 50% of all net leasing receipts received by Sony Music in connection with the master recordings obtained by Sony Music pursuant to the Sony Music Recording Agreements, when such master recordings have been leased to third parties.

5.      Instead of paying its Recording Artists half of the net leasing fee it receives for a digital download, Sony Music wrongfully treats each download as a sale of a physical phonorecord (i.e., a CD or cassette tape) through normal retail channels.  In doing so, Sony Music:

      (a)      underreports the actual number of digital downloads that occur;

      (b)      takes unauthorized container/packaging deductions; and,

      (c)      reduces its royalty payment by taking improper "audiophile deductions."

6.      Sony Music compounds its wrongdoing by withholding monies otherwise due the Class members as "reserves" against the returns of unsold phonorecords, when no such returns can ever occur.

7.      During the Class Period defined below and through the present, Sony Music has systematically and intentionally violated its obligations to Plaintiffs and the Class to make proper royalty payments and/or to properly credit royalty accounts pursuant to the royalty provisions (the "Record Royalty provisions") contained in the standard Sony Music recording or production agreements (hereinafter collectively the "Sony Music Recording Agreements").

8.      As a consequence of Sony Music's intentional past and continuing contractual breaches, Plaintiffs and Class members have been damaged in the amount of millions of dollars through the loss of royalty payments which Sony Music has retained for its own benefit.

9.      Plaintiffs seek (i) compensatory damages on behalf of Plaintiffs and the Class, and (ii) a judgment declaring Plaintiffs' and the Class' rights under the Sony Music Recording Agreements and the proper method of calculating payments of royalties or crediting royalty accounts with respect to the leasing of master recordings to third party Music Download Providers and Ringtone Providers, and requiring Sony Music to adhere to the proper methodology for calculation of such royalties in the future.

## THE PARTIES

10.      Plaintiff Gregg Allman ("Allman") is a musician, recording and performing artist who resides in the State of Georgia.

11.      Plaintiff Jaimoe f/k/a Johnny Lee Johnson ("Jaimoe") is a musician, recording and performing artist who resides in the State of Connecticut.

12.      Plaintiff Butch Trucks ("Trucks") is a musician, recording and performing artist who resides in the State of Florida.

13.      Allman, Jaimoe and Trucks are all members of "The Allman Brothers Band" and each are partners in "The Allman Brothers Band Record Company," a Florida partnership.

14.      Plaintiff Elmo Shropshire is a musician, recording and performing artist who resides in the State of California.

15.      Elmo Shropshire is a member of "Elmo & Patsy."

16.      Defendant Sony BMG Music Entertainment ("Sony Music"), a Delaware General Partnership in which Sony, Inc. and Bertelsmann, A.G. corporation are equal partners, has its principal place of business located in the county, city and State of New York and is found within the Southern District of New York.  At all relevant times, Sony Music was and continues to be in the business of producing, manufacturing, distributing, selling and otherwise commercially exploiting

sound recordings of musical performances and audio/video tape recordings containing such performances.

## **BACKGROUND**

### **Music Download Services**

17.     In recent years, a new method of sale of recorded music, music download services ("Music Download Services"), has developed which does not require the manufacture or distribution of physical phonorecords.  The companies offering Music Download Services (i.e., the Music Download Providers) include Apple, Buy.com, Full Audio Download, Liquid Audio, Microsoft, Music Net, Napster, Pressplay and Sony Connect, among others.  Upon information and belief, each of these companies has leased the use of master recordings from the major record companies (the Universal Music Group, EMI-Capitol, Warner-Elektra-Atlantic and Sony BMG) authorizing these companies to provide digital downloading of the recordings in each of their respective catalogues of musical recordings.

18.     Using Music Download Services, consumers pay a fee to download the musical performances in the form of a digital audio file (a "Music Download"), copying the file from the Music Download Provider to the consumers' personal computer or other digital storage device. Certain Music Download Providers, such as Napster, operate a subscription service which allows consumers to download musical performances for a set monthly fee, with the ability to play the musical performances contingent on the consumer's continuing payment of the monthly subscription charge.  Music Streaming Services, in contrast, allow consumers to play musical performances without downloading an entire digital audio file because the file is delivered, and processed, as a steady and continuous stream; this is analogous to television where one can watch a television program as it airs without ever downloading the actual program.

19.     Globally, in 2005, consumers downloaded 420 million music recordings from Music Download Providers, with such downloads now accounting for approximately 6 percent of record companies' receipts.  Subscriptions to Music Download Services, such as Napster, grew to 2.8 million in 2005, from 1.5 million in 2004.  The number of legal Music Download Services grew to 335, from only 50 in 2003.  Thus, sale of sound recordings by Music Download Providers now constitute a significant, and growing, component of record companies' receipts.

20.     Upon information and belief, with respect to Music Download Services, Sony Music need not manufacture any physical phonorecords, or ship any product to stores or other distribution points, and faces no risks of the return of unsold records.

21.     With regard to recordings sold by the Music Download Services, Sony Music is not making and selling phonorecords but rather has leased the master recordings of Plaintiffs and the other members of the Class to third parties to make digital downloads available to consumers.

22.     The growing percentage of music recordings distributed by Music Download Services means that Sony Music's improper accounting is significantly understating the royalties owed to Plaintiffs and the other members of the Class.

**Mobile Phone Ringtones**

23.     Ringtones provide another avenue for the distribution of music recordings as digital downloads.  A master ringtone is a portion of a song converted into a digital file which consumers download directly to their mobile phones to customize the sound the phones make when they receive a call or the sound a caller hears when the phone rings, paying $2 to $3 per ringtone downloaded.  Consumers buy ringtones from Ringtone Providers which include mobile phone companies (Cingular Wireless, Sprint, T-Mobile and Verizon Wireless, among others), content owners (MTV and VH1, among others) and third-party aggregators (Dwango Wireless, Hudson Soft and Zingy, among others).  Mobile phone companies may lease master recordings directly from

Record Companies or content owners, or from aggregators who lease master recordings from Record Companies and content owners and convert the recordings into various digital formats suitable for download as ringtones.

24.     Upon information and belief, Ringtone Providers have leased the use of master recordings from the major record companies (the Universal Music Group, EMI-Capitol, Warner-Elektra-Atlantic and Sony BMG) authorizing these companies to provide master ringtones ("Ringtones") of the recordings in each of their respective catalogues of musical recordings.  Record companies receive approximately 50% of the retail sales price of every Ringtone sold.

25.     In the United States, consumers paid more than $600 million to download Ringtones in 2005.  U.S. consumers downloaded the top selling Ringtone of 2005, "Candy Shop" by 50 Cent, more 1.9 million times.  Globally, revenues from the sale of Ringtones are expected to total more than $20 billion by the end of 2006.  Thus, sales of sound recordings by Ringtone Providers now constitute a significant, and growing, component of record companies' receipts.

26.     The importance of sales of Ringtones to the recording industry was highlighted by the Recording Industry Association of America's ("RIAA") announcement on June 15, 2006, that Ringtones would now be eligible for gold and platinum sales awards in the same way that top selling albums are.  To date, the RIAA has certified 128 titles as gold (500,000 downloads), platinum (1 million downloads) or multi-platinum (2 million or more downloads).  Four Ringtones were awarded multi-platinum status, forty were awarded platinum status, and eighty-four were awarded gold status.

27.     Upon information and belief, with respect to Ringtone Providers, Sony Music need not manufacture any physical phonorecords, or ship any product to stores or other distribution points, and faces no risks of the return of unsold records.

28.     With regard to Ringtones sold by Ringtone Providers, Sony Music is not making and selling phonorecords but rather has leased the master recordings of Plaintiffs and the other members of the Class to third parties to make ringtones available to consumers..

29.     The growing percentage of music recordings distributed by Ringtone Providers means that Sony Music's improper accounting is significantly understating the royalties owed to Plaintiffs and the other members of the Class.

**Sony Music Recording Agreements**

30.     On December 4, 1989, Allman, Jaimoe, Trucks (the "Allman Plaintiffs") and Forrest Richard Betts, through their partnership The Allman Brothers Band Record Company ("ABBRC") entered into a recording agreement with Sony Music.  The Allman Brothers Band's recording agreement (the "Allman Brothers Band Recording Agreement") (attached hereto as Exhibit A) governed, *inter alia*, the payment of both domestic and foreign royalties to The Allman Brothers Band for the sale and leasing of The Allman Brothers Band's sound recordings.  The royalty provisions of the Allman Brothers Band Recording Agreement are typical of those found in Sony Music Recording Agreements during the period from 1962 through 2002.

31.     Paragraph 9.03 of the Allman Brothers Band Recording Agreement provides in pertinent part that

> "In respect of any Master Recording leased by CBS to others for their distribution of Phonograph Records in the United States, CBS will pay you fifty percent (50%) of CBS' net receipts from its Licensee.  ("Net receipts", in the preceding sentence, means receipts as computed after deduction of all copyright, AFM and other applicable third party payments.)"

32.     "Phonograph Records" as defined in the Allman Brothers Band Recording Agreement includes digital downloads such as Music Downloads and Ringtones.

33.     The Allman Brothers Band Recording Agreement provides, *inter alia*, that the Allman Plaintiffs/ABBRC would perform, or cause to be produced, and deliver to Sony Music certain

recordings featuring their respective performances, and that Sony Music would manufacture, distribute, sell and lease these recordings in various configurations throughout the world.

34.     Under Section 9.03 of the Allman Brothers Band Recording Agreement, Sony Music agreed that where it leases the Allman Brothers Band master recordings, it will pay the Artist 50% of the net receipts from its licensee.

35.     In the Allman Brothers Band Recording Agreement, the use of the word "lease" in Section 9.03 is synonymous with "license," with no legal distinction from it.  Upon information and belief, Sony Music has treated "lease" in Section 9.03 as synonymous with "license."

36.     The Allman Plaintiffs and ABBRC have each performed their respective material obligations pursuant to the Allman Brothers Band Recording Agreement.

37.     The Allman Brothers Band Recording Agreement further provides, *inter alia*, that Sony Music would (a) provide various financial benefits to the Allman Plaintiffs/ABBRC, and (b) furnish the Allman Plaintiffs/ABBRC semi-annual royalty accounting statements setting forth the computations of each Allman Plaintiff's entitlement to royalties for the sale of that Allman Plaintiff's recordings, accompanied by any royalty payments due.

38.     On October 15, 1984, Elmo Shropshire ("Shropshire") and Patsy Shropshire ("Patsy"), p/k/a "Elmo & Patsy", entered into a recording agreement with Sony Music.  Elmo & Patsy's recording agreement (the "Elmo & Patsy Recording Agreement") (attached hereto as Exhibit B) governed, *inter alia*, the payment of both domestic and foreign royalties to Shropshire and Patsy for the sale and leasing of Elmo & Patsy's sound recordings.  The royalty provisions of the Elmo & Patsy Recording Agreement are typical of those found in Sony Music Recording Agreements during the period from 1962 through 2002.

39.     Paragraph 5.03 of the Elmo & Patsy Recording Agreement provides in pertinent part that:

> "In respect of any Master Recording leased by CBS to others for their distribution of Phonograph Records in the United States, CBS will pay you fifty percent (50%) of CBS' net receipts from its Licensee. ("Net receipts", in the preceding sentence, means receipts as computed after deduction of all copyright, AFM and other applicable third party payments.)"

40.     "Phonograph Records" as defined in the Elmo & Patsy Recording Agreement includes digital downloads such as Music Downloads and Ringtones.

41.     The Elmo & Patsy Recording Agreement provides, *inter alia*, that Shropshire and Patsy would perform, or cause to be produced, and deliver to Sony Music certain recordings featuring their respective performances, and that Sony Music would manufacture, distribute, sell and lease these recordings in various configurations throughout the world.

42.     Under Section 5.03 of the Elmo & Patsy Recording Agreement, Sony Music agreed that where it leases the Elmo & Patsy master recordings, it will pay the Artist 50% of the net receipts from its licensee.

43.     In the Elmo & Patsy Recording Agreement, the use of the word "lease" in Section 5.03 is synonymous with "license," with no legal distinction from it.  Upon information and belief, Sony Music has treated "lease" in Section 5.03 as synonymous with "license."

44.     The Elmo & Patsy Recording Agreement further provides, *inter alia*, that Sony Music would (a) provide various financial benefits to Shropshire and Patsy, and (b) furnish Shropshire and Patsy semi-annual royalty accounting statements setting forth the computations of Shropshire's and Patsy's entitlement to royalties for the sale of that person's recordings, accompanied by any royalty payments due.

45.     Shropshire and Patsy have performed their respective material obligations pursuant to the Elmo & Patsy Recording Agreement.

46.     Under the Allman Brothers Band Recording Agreement and the Elmo & Patsy Recording Agreement, the Sony Music Recording Agreements and the common law principles applicable to contractual relationships, Sony Music was obligated to act in good faith in its dealings with Plaintiffs and the other members of the Class, and to render accurate royalty accounting statements and to account and credit properly and accurately for the royalties generated by the sale of Plaintiffs' recordings and the recordings of other Class members.

## JURISDICTION AND VENUE

47.     Personal jurisdiction and venue exist and are proper pursuant to 28 U.S.C. §§ 1332(d)(2) and 1391(c) respectively because:

        (a)     The proposed class consists of more than 100 class members;

        (b)     At least one class member is of diverse citizenship from Defendant Sony Music;

        (c)     The amount in controversy exceeds $5,000,0000, exclusive of interest and costs;

        (d)     Defendant's principal place of business is located in the County of New York within the Southern District of New York;

        (e)     Many of the acts underlying the causes of action asserted herein, giving rise to this action, have occurred in New York County; and

        (f)     Sony Music conducts systematic and continuous business in New York County which business is related and connected to the causes of action alleged herein.

## CLASS ALLEGATIONS

48.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of themselves and all persons and entities, their agents,

successors in interest, assigns, heirs, executors and administrators, who are or were parties to Sony

Music Recording Agreements entered into at any time during the period of January 1, 1962 through

December 31, 2001 (the "Class"), through which Class members either directly or indirectly, have

received or are entitled to receive royalties or financial credits or adjustments, for the commercial

exploitation of master recordings through Sony Music's leasing of said master recordings to Music

Download Services and Ringtone Providers.  Excluded from the Class are the defendant and any

person, trust, firm, corporation or other entity affiliated with or related to the defendant.  This

action is properly maintainable as a class action.

49.     The class of persons and entities for whose benefit this action is brought is so

numerous that joinder of all Class members is impracticable.  While Plaintiffs do not presently know

the exact number of Class members and such information can only be ascertained through

appropriate discovery, Plaintiffs believe there are at least 2,500 Class members.

50.     There are questions of law and fact which are common to members of the Class and

which predominate over any questions affecting individual members.  These common questions

include:

(a)     Whether Sony Music violated the Sony Music Recording Agreements by, *inter

alia*, mischaracterizing leasing income as sales income in violation of said Agreements;

(b)     Whether Sony Music benefited financially from its wrongful acts;

(c)     Whether Plaintiffs and the other members of the Class have been damaged

by Sony Music's actions;

(d)     Whether Sony Music will continue to breach its contractual obligations to

Plaintiffs and the other members of the Class, absent the declaratory judgment relief sought by

Plaintiffs;

(e)     The proper measure of damages.

51.     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other members of the Class.  Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

52.     The prosecution of separate actions by individual members of the Class could create a risk of inconsistent or varying adjudications with respect to individual members of the Class which could establish incompatible standards of conduct for Sony Music, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the members of the Class not parties to the adjudications.

53.     Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the individual members of the Class to redress the wrongs done to them individually.

54.     Plaintiffs anticipate no difficulty in the management of this litigation as a class action. Class members may be identified from Sony Music's records and such Class members may be notified of the pendency of this action by mail, using techniques and a form of notice customarily used in class actions.

55.     For the above reasons, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## SUBSTANTIVE ALLEGATIONS

56.     Since at least January 1, 1962, Sony Music, or its predecessor, has entered into the Sony Music Recording Agreements with persons or entities in connection with the creation of master recordings, which entitles those persons or entities to receive royalties based upon the sale or

leasing of such master recordings, in the nature of payments, or credits against advances paid by Sony Music until such advances are recouped, after which royalties are paid.

57.    During the Class Period, Sony Music (or its predecessor CBS) entered into a Sony Music Recording Agreement with each musical artist or group whose musical performances Sony Music intended to exploit through the sale or leasing of master recordings of these performances both in the United States and abroad.

58.    The Sony Music Recording Agreements set forth and govern the calculation, distribution and payment to each Class member of royalties for the sale or leasing of sound recordings of his or her performances.

59.    Each Sony Music Recording Agreement executed by Sony Music during the Class Period contains an identical or virtually identical clause with a formula prescribing the manner in which Sony Music is required to calculate the payment of royalties earned by the Recording Artist for sound recordings sold in the United States and around the world and another formula prescribing Sony Music's obligation to account for and pay royalties to the Recording Artist for receipts from its licensees for the right to sell and exploit such sound recordings.

60.    Each Sony Music Recording Agreement sets forth the identical or virtually identical formula for calculating a Recording Artist's entitlement to a share of all leasing receipts received by or credited to Sony Music.

61.    Pursuant to the Sony Music Recording Agreement, Records and Phonograph Records are defined as:  All forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, including Records of sound alone and audiovisual Records (hereinafter, "Phonograph Records"). (See Ex. A, p. 38 ¶ 14.05, Ex. B, p. 14 ¶ 10.05.)

62.     Upon information and belief, Sony Music has leased all or part of its entire catalogue of master recordings to Music Download Providers and Ringtone Providers including one or more of the following entities: Apple, Buy.com, Full Audio Download, Liquid Audio, Microsoft, Music Net, Napster, Pressplay, Sony Connect, Cingular Wireless, Sprint, T-Mobile, Verizon Wireless, Dwango Wireless, Zingy, 9 Squared, HIFI Ringtones, IAM Mobile, Securycast, Arvato Mobile and Hudson Soft.

63.     Each Sony Music Recording Agreement provides that, with respect to any master recordings leased by Sony Music, Sony Music will pay 50% of Sony Music's net receipts therefrom (see Ex. A, pp. 16-17 ¶ 9.03, Ex. B, p. 3, ¶ 5.03).

64.     Sony Music's agreements with Music Download Providers and Ringtone Providers involve the leasing of master recordings to such Music Download Service Providers and Ringtone Providers for sale to the consumer in the form of digital music files, which are encompassed by the definition of "Phonograph Records" found in the Allman Brothers Band Recording Agreement, the Elmo & Patsy Recording Agreement and the Sony Music Record Agreements.

65.     Sony Music has failed to comply with the provisions of the Sony Music Recording Agreements and has accounted for the leasing of master recordings to third party Music Download Providers and Ringtone Providers as though Sony Music were actually directly selling such master recordings as physical phonorecords.  In so doing, Sony Music takes unjustifiable deductions and applies an incorrect formula for calculating royalties with respect to those royalties to be paid Plaintiffs and members of the Class on Sony Music's receipts from Music Download Providers and Ringtone Providers.

66.     In calculating royalties due to Plaintiffs and members of the Class for digital downloads of their recordings, Sony Music calculates "Net Sales" to be 85% of the units actually reported to have been downloaded.

67.     In calculating royalties due to Plaintiffs and members of the Class for digital downloads of their recordings, Sony Music takes a 15% to 25% deduction for "Container Charges" to cover the cost of packaging although digital downloads require no such packaging.

68.     In calculating royalties due to Plaintiffs and members of the Class for digital downloads of their recordings, Sony Music takes a 25% to 50% "audiophile deduction."

69.     Sony Music's accounting practices as identified above permit it to retain practically the full amount of receipts from Music Download Services and Ringtone Providers rather than paying artists the 50% of net receipts provided for in Sony Music Recording Agreements.  A comparison of the current methodology employed by Sony Music in accounting for Music Downloads and the correct methodology follows:

| CURRENT METHOD | |
|---|---|
| **1000 Units Downloaded** | **1000** |
| Less Net Sales Deduction (15%) | (150) |
| **Units Downloaded Credited to Plaintiffs** | **850** |
| Alleged Total Wholesale Revenue per unit | $0.70 |
| Less Mechanical Royalty Payments to publishers per unit (approx. $0.069 per unit)[1] | ($0.069) |
| Alleged Wholesale Download Price per unit | $0.631 |
| Total Alleged Wholesale Download Price (850 units x .631 per unit) | $536.50 |
| Less Container Charge (20%) | ($107.50) |
| Less Audiophile Deduction (50%) | ($268.75) |
| Royalty Base Price | $160.25 |
| Royalty Rate (30%)[2] | x   .30 |
| **Royalty Owed** | **$45.05** |

| CORRECT METHOD | |
|---|---|
| **1000 Actual Units Downloaded** | **1000** |
| Net Receipts to Sony Music for 1000 units sold at $0.70 per unit | $700.00 |
| Less Mechanical Royalty Payments to publishers (approx. $0.069 per unit) | ($ 69.00) |
| | $631.00 |
| Royalty Rate (at 50% of net leasing receipts) | x   .50 |
| **Royalty Owed** | **$315.50** |

[1]  This factors in a 3/4 statutory mechanical royalty rate of 6.83 cents per unit instead of a full statutory mechanical royalty rate of 9.1 cents per unit, as the former rate is more prevalently used.

[2]  Note that this Royalty Rate is for The Allman Brothers Band.  Specific royalty rates for other Class Members will vary.

70.     Thus Sony Music's inappropriate treatment of the net receipts from Music Download Providers, in violation of Sony Music Recording Agreements, results in Plaintiffs and the other members of the Class receiving approximately $45.05 per one thousand Music Downloads instead of the $315.50 to which they are entitled (i.e., less than 15% of the compensation which they are due).

71.     Similarly, Sony Music's inappropriate treatment of the net receipts from Ringtone Providers, in violation of Sony Music Recording Agreements, results in Plaintiffs and the other members of the Class receiving approximately $83 per one thousand Ringtones downloaded instead of the $500 to $750 to which they are entitled (i.e., between 11% and 16.6% of the compensation which they are due).

72.     At all relevant times, Sony Music had a duty and obligation under the Allman Brothers Band, Elmo & Patsy and Sony Music Recording Agreements to account properly and accurately for royalties received by Sony Music from Music Download Providers and Ringtone Providers to which Sony Music has leased the recordings of Plaintiffs, and the other members of the Class.  Rather than fulfill its contractual obligations, Sony Music has systematically miscalculated the royalties due and owing to Plaintiffs and other Class members.  As a result, Sony Music has under credited and/or underpaid each and every Class member, while deriving substantial financial benefits from leasing Class members works to Music Download Providers and Ringtone Providers for digital distribution.

## FIRST CAUSE OF ACTION
### (Breach of Contract with respect to Music Download Services)

73.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 72, as though fully set forth herein.

74.     On November 8, 2005, a representative of Allman, Jaimoe, Trucks and ABBRC notified Sony Music that Sony Music's improper calculation of leasing royalties for digital downloads leased to Music Download Services was in violation of the Allman Brothers Band Recording Agreement.

75.     Despite said notice, Sony Music has failed to cure these breaches and continues to incorrectly calculate leasing royalties in violation of the Allman Brothers Band Recording Agreement.

76.     By reason of the foregoing, and other acts not presently known to Plaintiffs, Sony Music has knowingly and materially breached its contractual obligations under the Allman Brothers Band Recording Agreement, the Elmo & Patsy Recording Agreement and the Sony Music Recording Agreements and has wantonly disregarded the rights of Plaintiffs and the other Class members.

77.     By reason of the foregoing, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial, which upon information and belief is in excess of twenty-five million dollars ($25,000,000).

## SECOND CAUSE OF ACTION
### (Declaratory Judgment with respect to Music Download Services)

78.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 77, as though fully set forth herein.

79.     Plaintiffs contend that, pursuant to the Sony Music Recording Agreements, Sony Music is obligated to pay and/or credit Plaintiffs and the other Class members 50% of the net receipts Sony Music derives from leasing the sound recordings of Plaintiffs and the other Class members to Music Download Services for sale.

80.     Plaintiffs and the other Class members have no adequate remedy at law.

81.     By reason of the foregoing, there is a present controversy between Plaintiffs, and the other Class members, and Sony Music with respect to which a declaratory judgment should be entered determining that the Sony Music Recording Agreements obligate Sony Music to pay and/or credit Plaintiffs and the other members of the Class 50% of the net receipts Sony Music receives from leasing the sound recordings of Plaintiffs, and the other members of the Class, to Music Download Services for sale.

## THIRD CAUSE OF ACTION
### (Breach of Contract with respect to Ringtone Providers)

82.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 81, as though fully set forth herein.

83.     On November 8, 2005, a representative of Allman, Jaimoe, Trucks and ABBRC notified Sony Music that Sony Music's improper calculation of leasing royalties for digital downloads leased to third parties was in violation of the Allman Brothers Band Recording Agreement.

84.     Despite said notice, Sony Music has failed to cure these breaches and continues to incorrectly calculate leasing royalties in violation of the Allman Brothers Band Recording Agreement.

85.     By reason of the foregoing, and other acts not presently known to Plaintiffs, Sony Music has knowingly and materially breached its contractual obligations under the Allman Brothers Band Recording Agreement, the Elmo & Patsy Recording Agreement and the Sony Music

Recording Agreements and has wantonly disregarded the rights of Plaintiffs and the other Class members.

86.     By reason of the foregoing, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial, which upon information and belief is in excess of twenty-five million dollars ($25,000,000).

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment with respect to Ringtone Providers)

87.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 86, as though fully set forth herein.

88.     Plaintiffs contend that, pursuant to the Sony Music Recording Agreements, Sony Music is obligated to pay and/or credit Plaintiffs and the other Class members 50% of the net receipts Sony Music derives from leasing the master recordings of Plaintiffs and the other Class members to Ringtone Providers for sale.

89.     Plaintiffs and the other Class members have no adequate remedy at law.

90.     By reason of the foregoing, there is a present controversy between Plaintiffs, and the other Class members, and Sony Music with respect to which a declaratory judgment should be entered determining that the Sony Music Recording Agreements obligate Sony Music to pay and/or credit Plaintiffs and the other members of the Class 50% of the net receipts Sony Music receives from leasing the master recordings of Plaintiffs, and the other members of the Class, to Ringtone Providers for sale.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the putative Class, pray for judgment against Sony Music as follows:

A.       Determining that this is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.       On the First Cause of Action, a judgment awarding Plaintiffs and the other Class members compensatory damages in excess of twenty-five million ($25,000,000) dollars, the exact amount to be proven at a trial of this action;

C.       On the Second Cause of Action, an order and judgment declaring that Sony Music Recording Agreements obligate Sony Music to pay and/or credit Plaintiffs and the other members of the Class 50% of the net receipts that Sony Music receives from Music Download Services' sales of digital downloads of music performed by Plaintiffs, and the other members of the Class;

D.       On the Third Cause of Action, a judgment awarding Plaintiffs and the other Class members compensatory damages in excess of twenty-five million ($25,000,000) dollars, the exact amount to be proven at a trial of this action;

E.       On the Fourth Cause of Action, an order and judgment declaring that Sony Music Recording Agreements obligate Sony Music to pay and/or credit Plaintiffs and the other members of the Class 50% of the net receipts that Sony Music receives from Ringtone Providers' sales of digital downloads of music performed by Plaintiffs, and the other members of the Class;

F.       Awarding Plaintiffs and the Class pre- and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, costs and expenses; and

G.     Awarding such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       March 23, 2009

                              Respectfully submitted,

                              CAPLAN & ROSS, LLP


                              By: _____
                                   Brian D. Caplan

                              Brian D. Caplan
                              100 Park Avenue, 18th Floor
                              New York, New York 10017
                              Tel:  212-973-2376
                              Fax: 212-661-4290

                                   -and-

                              LABATON SUCHAROW LLP
                              Christopher J. McDonald
                              140 Broadway
                              New York, NY 10005
                              Tel:  212-907-0700
                              Fax: 212-818-0477

                                   -and-

                              PROBSTEIN & WEINER
                              Gerald B. Weiner
                              9696 Culver Blvd., Suite 205S
                              Culver City, CA  90232
                              Tel:  310-836-1400
                              Fax: 310-836-1420

                              *Counsel for Plaintiffs*